**Alvin McLEAN, Petitioner,**

v.

**Michael McGINNIS, Superintendent, Southport Correctional Facility, and Glenn C. Goord, Commissioner, Respondents.**

No. 97–CV–3593(JG).

United States District Court, E.D. New York.

Oct. 21, 1998.

Malvina Nathanson, New York City, for petitioner.

Richard A. Brown, District Attorney, Queens County by John M. Castellano, Cheryl Hone, Assistant District Attorneys, Kew Gardens, NY, for respondent.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

Alvin McLean petitions for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging a judgment of the Supreme Court of the State of New York, Queens County, that found him guilty of Murder in the Second Degree (N.Y.Penal Law § 125.25[1] ), Attempted Murder in the Second Degree (N.Y. Penal Law §§ 110.00/125.25[1] ), Robbery in the First Degree (N.Y.Penal Law § 160.15[1] ), Assault in the First Degree (N.Y.Penal Law § 120.10[1] ), and two counts each of Criminal Use of a Firearm in the First Degree (N.Y.Penal Law § 265.09[1] ), Criminal Possession of a Weapon in the Second Degree (N.Y.Penal Law § 265.03), and Criminal Possession of a Weapon in the Third Degree (N.Y.Penal Law § 265.02[4] ).

Petitioner was sentenced to concurrent indeterminate prison terms of from twenty-five years to life for murder, eight and one-third to twenty-five years for robbery, five to fifteen years for assault, two terms of eight and one-third to twenty-five years for use of a firearm, two terms of five to fifteen years for second-degree weapon possession, and two terms of two and one-third to seven years for third-degree weapon possession. Petitioner also received an indeterminate prison term of from eight and one-third to twenty-five years for attempted murder, to run consecutively with his other sentences. In total, petitioner is to serve thirty-three and one-third years to life in prison. He is currently incarcerated pursuant to that judgment.

Petitioner claims that trial court rulings limiting the evidence he was able to present in his defense denied him his rights to due process and to confront witnesses. For the reasons set forth below, the petition is denied.

### FACTS

In August 1987, fifteen-year-old James Garcia was staying with his friend Andrew Garret in the basement of a single family house in Queens, New York. Both Garret and Garcia were working for Filmore Gayle, known as "Phil," and Tyrone Lawrence, known as "Tee." Phil and Tee had a marijuana distribution organization, called "Pillow." Both formerly belonged to a rival marijuana distribution organization called "Slice." Garfield Wright, known as "Sarge," was a member of Slice.

### A. The People's Case

At trial, Garcia testified to the following sequence of events. On August 3, 1987, Garret telephoned Garcia at approximately 10:30 p.m. and told Garcia he would meet him in his basement room in about half an hour. At approximately 11:00 p.m., Garret and petitioner knocked, and Garcia let them into the basement. Petitioner, who was behind Garret, pointed a .357 magnum revolver over

Garret's shoulder towards Garcia. Petitioner ordered Garret and Garcia down onto the floor. Once they complied, he ordered them to put their feet underneath the bed and their hands over their head, which they did. After petitioner tapped the basement window from the inside, Wright joined the group in the basement. Wright asked petitioner if they should "waste [Garret and Garcia] now," and petitioner responded that they would wait for Phil and Tee to arrive.

As they waited, petitioner asked Garret and Garcia whether they had any marijuana, guns, or money. Garcia said no, but Garret offered the money in his pocket, which petitioner took. Petitioner later kicked Garcia in the face and told him not to look at him. Garcia had seen petitioner with Wright on a street corner in Queens a week before the shooting.

About ten minutes after he kicked Garcia in the face, petitioner shot Garret in the face and Garcia in the back from five or six feet away. After the first shots, both men were shot several more times. Garcia pretended that he was dead until the three men left. The entire incident lasted approximately thirty minutes.

Garcia was able to call 911. At trial, police officers Joseph Bonaventura and Peter Tannzo testified that when they arrived at the scene, Garcia was lying in a pool of blood, groaning, and drifting in and out of consciousness. The officers testified that at one point, Garcia said, "Slice did this" or "Slice did it to me," Tr.[1] at 496, 555, 557–58, 564, 581, 617, and, later, "Slice did this, shot me with an Uzi" or "Slice did it to me," Tr. at 495–96, 553, 559, 565, 584. Garret was dead, face down on the floor, halfway under the bead, with bullet holes in his face and back.

An ambulance took Garcia to Booth Memorial Hospital. On August 5, 1987, the second day after the shooting, Garcia regained consciousness. The two detectives who interviewed Garcia in the hospital, Robert Cianfrone and Frank DeRosalia, testified that he was unable to speak because he had a tube

down his throat but communicated with them by nodding his head or blinking his eyes. Using that method, Garcia indicated that he knew both shooters' faces, but not their names, and that they had two different guns, an Uzi and a .357 revolver. When Cianfrone showed Garcia an array of six photographs, which did not include petitioner, Garcia identified Wright as the shooter with the machine gun.

Cianfrone testified that Garcia told them on that day that both shooters belonged to the Slice organization. Cianfrone testified that he did not recall Tee, a police informant, being present at this first interview of Garcia. Tr. at 749–50, 841. DeRosalia testified that Tee did not accompany them. Tr. at 1103–04.

Two days later, on August 7, 1987, Tee, acting as a police informant, led the detectives to Slice headquarters, the second-floor apartment at 211–51 Jamaica Avenue, Queens, New York, where they arrested Wright. Four other men were in Wright's apartment, including petitioner. After detective Cianfrone read the *Miranda* warnings to them all, the four who were not arrested agreed to accompany the detectives and Wright to the police station. At the station, Wright waived his *Miranda* rights and made audio and videotaped statements. The other four men waived their rights and agreed to be photographed.

The detectives created an array from these photos and two others and took it to Garcia. Garcia identified petitioner as the second shooter, the one with the .357 magnum. According to Cianfrone, Tee was not present during this identification procedure. Tr. at 841.[2] Based on Garcia's identification, Detective Cianfrone returned to the police station and arrested petitioner. Once again, he waived his *Miranda* rights and agreed to speak to the detectives. The detectives testified that petitioner admitted to them that "Murphy" had driven petitioner and Wright, known as "Sarge," to 153rd Street and Hillside Avenue on the night of the shootings.

1. "Tr." refers to the pages of the trial transcript.

2. DeRosalia, who did not go on the second hospital visit, but was present when Cianfrone departed for the hospital, testified that he could not recall whether or not Tee had accompanied Cianfrone. Tr. at 1104, 1111, 1117–18.

He admitted that they had gone there to look for Phil and Tee, who ran the Pillow organization, because Pillow had been taking customers from Slice. Petitioner stated that a "Mr. Mack," who Detective Cianfrone understood to be the same person as "Murphy," had told petitioner and Wright to get Garret into the car if they could not find Phil or Tee. They did so, and when Garret could not tell them where Phil and Tee were, Wright ordered him at gunpoint to bring them to Pillow headquarters.

Petitioner stated that he had threatened Garret and Garcia with a .357 revolver and ordered the two men to lie on the floor. He said that he left Wright, who had an Uzi, with Garcia and Garret in the basement premises in order to talk to Murphy, who was waiting outside in the car. He claimed that on his way back to the basement, he heard shots. Wright then came running out of the basement, exclaiming "I had to dust them." Tr. at 685, 1073. Murphy then drove petitioner and Wright to 169th Street and Hillside Avenue, and Murphy kept the .357 and Uzi.

After being arrested and charged with the shootings, petitioner escaped from prison in February 1988, while awaiting trial. Nearly five years after the shooting, on June 6, 1992, petitioner led Special Agents Thadius Buggs and Thomas Larned of the Federal Bureau of Investigations ("FBI") on a high-speed chase through the streets of Miami, Florida. Ultimately, the agents apprehended petitioner and brought him to the FBI building in North Miami. The agents testified that petitioner, who identified himself as "Bobby Broadway," stated to them that "I would've been out by now if I'd stayed in New York. I was a, what-do-you-call-it, an accessory." Tr. at 1363, 1399, 1401–02, 1411, 1445, 1495, 1497.

Detective Thomas Natale, an expert in firearms and ballistics, testified that, based on his examination of the forensic evidence collected by the medical examiner and the ballistics evidence collected from the scene, at least two types of guns had been used in shooting Garrett and Garcia. He further testified that one of those guns could have been a .357 revolver, while the other must have been an Uzi, or machine gun.

## B. *The Defense Case*

Petitioner's theory of the case was that Garrett and Garcia were shot by Wright and Peter Young, who was also known as "Mack," "Mr. Mack," "Peter Mack," and "Slice" (hereinafter "Mack"). In support of this theory, Wright, Tee, and Jeffrey Young, Mack's younger brother (hereinafter "Young"), testified on petitioner's behalf at trial. By the time of petitioner's trial, Mack had died in prison. His brother Jeffrey was serving 50 years to life in prison for two murders. Wright was serving fifteen years to life for his role in murdering Garret and shooting Garcia. Tee had been convicted of various minor offenses, and one of the eight bench warrants against him was executed at the conclusion of his testimony.

Wright, Young, and Tee testified that petitioner was not a member of Slice, and that Mack was the boss of the Slice organization. Wright and Young testified that on August 3, 1987, they went to Mack's house to discuss the fact that Phil and Tee had been taking away Slice customers. After this discussion, Mack and Wright left Young at the house and took a Mac–11 machine gun in Mack's red Nissan and picked up Garret and drove him to Garcia's basement room at Hillside and 153rd Street. Mack ordered Garret and Garcia to lie on the floor because he was angry about having to wait for Phil and Tee. At some point, Mack told Garret, a former Slice member, that he was supposed to be working for Slice, not for Phil and Tee. Mack then shot Garret in the back. He passed the gun to Wright, and Wright "finished the job." Tr. at 1649, 1691.

Mack and Wright then went back to Mack's apartment. They left the machine gun with Young, who dismantled it and disposed of its various pieces by tossing them out his car window as he drove. Two days later, the police went to Slice headquarters. According to Tee, he was there because he had heard that members of Slice had shot Garret and Garcia. He testified that he was not acting as a police informant and never had acted as one. Tee also testified that

although petitioner was at Slice headquarters when the police arrived, petitioner did not belong to Slice. Police handcuffed all the men at the headquarters and brought them to the police precinct.

Wright testified that at the precinct, the police beat him and tried to get him to admit that Mack had been his accomplice. Wright testified that he was afraid of Mack so he falsely told the police that petitioner, not Mack, had been his accomplice. The prosecution offered, and the court accepted, Wright's videotaped confession into evidence to impeach his testimony that the police had beaten him into implicating petitioner.

Tee testified that on August 5, 1987, he accompanied Detectives Cianfrone and De-Rosalia to the hospital to see Garcia, who communicated with him by blinking his eyes. Two days later, Tee again went with the detectives to see Garcia in the hospital, and, although Garcia still could not speak, the detectives showed him two individual photographs, one of Mack and one of petitioner, and then an array of photographs. Defense counsel was not permitted to ask Tee whether, in contradiction to Garcia's trial testimony, Garcia had identified Mack as the shooter who accompanied Wright, or if Garcia had told him that the second shooter was a light-skinned Jamaican man with a gold tooth. On cross-examination, Cianfrone admitted that he had taken a picture of Mack to the hospital, but stated that he did not show that picture to Garcia. Tr. at 839.[3]

The defense theory was that Garcia's own statements to the police when they found him immediately after the shooting that "Slice did it" and "Slice did this to me" indicated that Peter Young, also known as "Mack" and "Slice," shot him. The petitioner now argues that the trial court's incorrect rulings and instructions prevented him from being able to present effectively the defense that Mack was the shooter.

## C. Procedural History

Petitioner and Wright were jointly charged with two counts of Murder in the Second Degree, Robbery in the First Degree, Assault in the First Degree, two counts each of Criminal Use of a Firearm in the First Degree, Criminal Possession of a Weapon in the Second Degree, and Criminal Possession of a Weapon in the Third Degree.

In February 1988, approximately one week after petitioner escaped from jail, Wright pled guilty to Murder in the Second Degree in exchange for the fifteen years to life sentence mentioned above.

On November 19, 1993, a jury convicted petitioner on all counts except for felony murder. Petitioner appealed his conviction to the Appellate Division, Second Department, raising six grounds for reversal: (1) he was deprived of due process when the court precluded certain cross-examination of People's witnesses and certain testimony of defense witnesses; (2) he was deprived of a fair trial by certain of the prosecutor's statements and questions posed to witnesses; (3) he was deprived of a fair trial by the verdict sheet submitted to the jury; (4) he was deprived of a fair trial because the court erroneously admitted evidence that improperly bolstered Garcia's identification of petitioner; (5) the court erroneously permitted the prosecution to impeach Wright's testimony with Wright's videotaped statement to the police upon his arrest, and the jury instructions on prior inconsistent statements did not sufficiently apprise the jury that this impeachment material could not be considered as substantive evidence; and (6) the trial court should have suppressed petitioner's inculpatory statement and Garcia's identification of him as the fruit of an unlawful arrest.

---

3. On cross-examination, Cianfrone admitted that his notes read, "# 5 Mack (Boss of 'Slice')," Tr. at 861, and that Garcia identified photo # 5 from the photo array as the second shooter. Tr. at 840, 847. Defense counsel attempted to admit Cianfrone's notes into evidence, but an objection was sustained on the theory that Cianfrone had already admitted orally the relevant portions of the notes. Cianfrone's notes show that he wrote on one page, dated August 5, 1987, "Mr. Mack is *Slice*," and under that, "516–358–7693" (Mack's phone number), and under that, "# 5 Photo." Exh. C–1, Nathanson Affirmation in Support of Petitioner's Writ for Habeas Corpus. Another page of Cianfrone's notes shows that he also wrote "Peter Young" under the notation "# 5 Mack (Boss of 'Slice')." Exh. C–3, Nathanson Affirmation.

In affirming the conviction, the Appellate Division found that the trial court properly denied petitioner's motion to suppress his inculpatory statements and Garcia's identification of him. *People v. McLean,* 226 A.D.2d 396, 640 N.Y.S.2d 265 (2d Dep't 1996). The court also held that the trial court properly admitted Wright's prior inconsistent statements in the from of his videotaped confession and properly instructed the jury on the use of that evidence. *Id.* at 397, 640 N.Y.S.2d 265. The court held that petitioner's remaining contentions were "either unpreserved for appellate review or without merit." *Id.*

Petitioner then sought leave to appeal to the New York Court of Appeals. The Court of Appeals, on June 20, 1996, denied petitioner's application. *People v. McLean,* 88 N.Y.2d 938, 647 N.Y.S.2d 172, 670 N.E.2d 456 (1996).

In his petition to this Court, petitioner claims that a number of the trial court's evidentiary rulings deprived him of a fair trial. Specifically, petitioner contends that the trial court erroneously precluded petitioner from introducing (1) testimony by Tee that Garcia had identified a photograph of Mack as one of the shooters and had described the second shooter as a light-skinned Jamaican man with a gold tooth; (2) evidence that a non-testifying police officer wrote in a police report that the detective who interviewed Garcia had told him that Garcia said that "another guy was with Slice;" (3) testimony that Detective Cianfrone had a nickname within the Slice organization and had received money from Mack; and (4) an alleged confession by Mack to his brother. Petitioner also claims the trial court improperly refused to instruct the jury that it had admitted Wright's videotaped statement solely to permit the prosecution to impeach Wright's testimony that the police had beaten him into implicating Mack.[4]

The respondent argues that these claims should be rejected because the court afforded petitioner ample opportunity to present his theory of the defense, and it properly excluded some of the evidence proffered in support of the defense on the grounds that the evidence was unreliable or unduly prejudicial. In any event, the respondent argues, since the evidence of petitioner's guilt was overwhelming and the likelihood that any of the excluded evidence or the requested jury instruction on prior inconsistent statements would have changed the outcome of the trial remains extremely small, any error was harmless.

## *DISCUSSION*

### A. *Exhaustion and Procedural Default*

 Before a federal court may consider a state prisoner's petition for a writ of habeas corpus, the petitioner must have exhausted all available state judicial remedies. 28 U.S.C. § 2254(b); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). In order to exhaust his state remedies, a petitioner must have fairly presented his federal constitutional claims to the highest state court. *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). A petitioner has fairly presented a claim if he or she apprised the state courts of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Id.* Even if a petitioner raises precisely the same legal claims in state and federal proceedings, reliance in the two proceedings upon different factual grounds that fundamentally alter the legal claim will foreclose a conclusion that the claim is exhausted. *Vasquez v. Hillery,* 474 U.S. 254, 260, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). "However, the basic requirement remains that 'the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature.'" *Jones v. Vacco,* 126 F.3d 408, 413 (2d Cir.1997) (quoting *Daye,* 696 F.2d at 192).

Previously, if a petition contained both exhausted and unexhausted claims the petition

---

**4.** Though it is not clear from the papers submitted, petitioner's counsel clarified at oral argument that petitioner's claim with respect to the videotape concerns only the failure to limit its use, not its introduction for impeachment purposes. *See* Tr. of Oral Argument, Feb. 27, 1998, at 15–16.

was dismissed. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal district court now has discretion to deny a petition that contains both exhausted and unexhausted claims on the merits. 28 U.S.C. § 2254(b)(2).

■ In *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the Supreme Court reasoned that, like the failure to exhaust a claim, the failure to satisfy the state's procedural requirements deprives the state courts of the first opportunity to correct constitutional errors. Nevertheless, when a habeas petitioner no longer has any state remedies available to him (*i.e.,* when a petitioner has defaulted his federal claim in state court), such claims are deemed exhausted even though the state courts have had no opportunity to previously consider them. A federal court need not require that a federal claim be presented to a state court if the state court would hold the claim to be procedurally barred. *Grey v. Hoke,* 933 F.2d 117 (2d Cir.1991) (citing *Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)).

■ Because a state procedural bar represents an adequate and independent state ground for deciding the claim against the petitioner, however, a federal habeas court may review a procedurally barred claim on the merits only if the petitioner demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

5. Although not stated in the papers, at oral argument petitioner's lawyer indicated that it is petitioner's contention that the trial court should have given a limiting instruction that the videotape could only be used to impeach Wright's statement that he had been beaten by the police, and could not be used to impeach his statement at trial that Mack was his accomplice. To the extent that petitioner's claim rests on a request for the more specific instruction, it is unexhausted, and neither cause nor prejudice has been

1. *Exhaustion of the Claim Regarding the Jury Charge*

■ Petitioner has asserted five claims for relief in his habeas petition. Respondent argues that petitioner's claim (Ground Two, ¶ 25) that the trial court failed to give a limiting instruction regarding Wright's videotaped confession is unexhausted. Petitioner points out that at trial and on appeal, petitioner's counsel claimed that the court should have instructed the jury that it received the videotape into evidence only for the purpose of impeachment. Specifically, in his brief to the Appellate Division, petitioner argued that he was "denied due process of law when the court ... [refused] to instruct the jury that prior inconsistent statements are not evidence in chief." Exh. A, Habeas Petition at 42. In the instant application, petitioner argues that his due process rights were violated because Wright testified that petitioner did not commit the crime and a "prior inconsistent statement of the co-perpetrator was used as evidence-in-chief rather than as impeaching evidence." Habeas Petition Ground Two.[5]

■ The essence of petitioner's claim, in state court and here, is that the trial court should have given the jury a limiting instruction. In order to satisfy the exhaustion doctrine, a petitioner must set forth in the appropriate state courts all the essential factual allegations and substantially the same legal doctrines asserted in the federal petition. *Daye,* 696 F.2d at 191–92. Petitioner has been consistent in both respects: he has alleged that the court admitted the videotape solely to impeach Wright's testimony about his confession and that the court's charge was inadequate. Therefore, the claim is exhausted.[6]

demonstrated. In any event, such a claim lacks merit. A jury charge specifically directing that the video was to be considered solely for impeachment purposes would have been sufficient.

6. In any event, if the claim were deemed unexhausted, I exercise my discretion under 28 U.S.C. § 2254(b)(2) to deny a petition that contains both exhausted and unexhausted claims on the merits.

### 2. Procedural Default of Claim Regarding Tee's Testimony

 Respondent also argues that petitioner's first claim, that he was denied a fair trial by being precluded from introducing evidence that Garcia identified someone else as the shooter, is procedurally barred since it was dismissed by the Appellate Division on independent and adequate state grounds. A federal court may not review a "question of federal law decided by a state court if the decision rests on a state law that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729, 111 S.Ct. 2546. As a result, the adequate and independent state ground doctrine bars a federal court from reviewing a petitioner's claim if it was dismissed in the state courts because the petitioner failed to meet a state procedural requirement. *Id.* 501 U.S. at 729–30, 111 S.Ct. 2546. However, "a procedural default does not bar consideration of a federal claim on habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Tankleff v. Senkowski*, 135 F.3d 235, 247 (2d Cir.1998) (quoting *Coleman*, 501 U.S. at 735, 111 S.Ct. 2546).

In this case, the Appellate Division directly addressed only two of petitioner's claims (a *Miranda* violation claim and the claim that Wright's videotaped confession was not properly admitted and the jury instruction was inadequate). *People v. McLean*, 226 A.D.2d at 397, 640 N.Y.S.2d 265. All other claims were found to be "either unpreserved or without merit." *Id.* Based on this statement, it is unclear whether the Appellate Division rejected petitioner's claim regarding exclusion of Tee's testimony at trial because it was unpreserved or because the Appellate Division deemed it meritless as a matter of federal constitutional law. Such a statement is too ambiguous to preclude federal review on the independent ground of procedural default. *Id.* 135 F.3d at 247.[7] For this reason, the claim is subject to federal habeas review.

### B. Legal Standards In Reviewing State Court's Rulings

Under the AEDPA, a state prisoner's application for a writ of habeas corpus may not be granted with respect to any claim that was adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Petitioner claims that certain errors of state law at his trial, including exclusion of relevant defense evidence and erroneous admission of state evidence, operated to deprive him of his due process right to present a defense as guaranteed by the Fourteenth Amendment. It is well established that the due process right of an accused in a criminal trial includes the right to a "fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In particular, "[t]he rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Id.*

 However, even erroneous state evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas cor-

---

**7.** Since *Tankleff*, the Second Circuit has clarified that the *Tankleff* holding did not necessarily rest on this proposition. *See Hayes v. Coombe*, 142 F.3d 517, 519 (2d Cir.1998). Rather, the holding in *Tankleff* could also be explained as relying on the presumption set forth in *Ylst v. Nunnemaker*, 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (holding that when lower state court speaks clearly all unexplained affirmances by higher state courts must ordinarily be read to confirm the unambiguous holding of lower court), since the ambiguous affirmance in the state court in *Tankleff* followed a clear lower court ruling on the merits. *See Hayes*, 142 F.3d at 519 n. 2. However, the *Hayes* court stated that *Tankleff* "could be read as negatively disposed" to expansion of the rule that a state court's silent rejection of an appeal creates a presumption against habeas review. *Id.* 142 F.3d at 519. In fact, the *Hayes* court pointed out that *Coleman* itself appeared to distinguish between "silent state court affirmances and those that are facially ambiguous." *Id.* 142 F.3d at 519 n. 1. Accordingly, without clear precedent to the contrary, following the lead of *Tankleff*, I decline to hold that the state court's facially ambiguous statement in the instant case precludes habeas review on the merits.

pus. Rather, erroneous exclusion of evidence warrants habeas relief only if the omission deprived the petitioner of a fundamentally fair trial. *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991); *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983). The test for determining whether erroneous evidentiary rulings denied the defendant a fair trial centers on whether the excluded evidence would have created "a reasonable doubt that did not otherwise exist." *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Even a constitutional error does not require granting of a habeas petition unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

## C. The Evidentiary Rulings at Issue

### 1. Garcia's Prior Identification of Mack and Description of the Shooter

Both Garcia and Detective Cianfrone testified that they had not shown single photographs to Garcia in the hospital on the day he viewed the photo array and identified the petitioner as the second shooter. Tee testified for the defense that he went to the hospital with Detectives Cianfrone and DeRosalia when they showed Garcia the photo array and that the police showed Garcia separate photographs of petitioner and another separate photograph of Mack. The court ruled, however, that it was inadmissible hearsay for defense counsel to ask Tee whether or not Garcia identified Mack as the second shooter (the first being Wright), in contradiction to Garcia's trial testimony that he had identified the petitioner.

Similarly, the court ruled that Tee could not testify about descriptions Garcia gave

him of the shooter, which contradicted Garcia's trial testimony. Specifically, Tee would have testified that Garcia described Wright's accomplice as a light-skinned Jamaican man with a gold tooth, a description that did not fit petitioner. The court ruled that this testimony also constituted inadmissible hearsay.[8]

### a. Admission as Substantive Evidence

■ Respondent correctly argues that testimony that another witness made a pre-trial identification is hearsay. *Mitchell v. Hoke*, 930 F.2d 1, 2–3 (2d Cir.1991); *People v. McIlwain*, 205 A.D.2d 710, 613 N.Y.S.2d 674 (2d Dep't 1994). Similarly, Tee's repetition of Garcia's alleged out-of-court physical description of the second shooter constitutes hearsay. Respondent argues, therefore, that the testimony concerning Garcia's prior identification and description could properly have been admitted as substantive evidence only if the surrounding circumstances demonstrated that it had such strong probative value and indicia of reliability that the State had no legitimate interest in precluding the testimony on grounds of unreliability. *See Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). I agree with respondent that petitioner has not met this standard here.

Petitioner offered no reliable, relevant evidence to corroborate Tee's proposed testimony that Garcia identified Mack at the hospital on August 7. Detective Cianfrone testified that Tee was not even present when Garcia identified petitioner as the second shooter.[9] Since Tee maintained that he was not an informant, and detectives do not ordinarily bring stray drug dealers along when showing photo arrays, Tee's claim to have been present lacked indicia of reliability.

---

**8.** Respondent contends that defense counsel did not sufficiently make a record before the trial court as to what Tee would have testified about, if permitted, and that it remains speculation at this point to assume that he would have testified that Garcia identified a photograph of somebody other than petitioner. I agree with petitioner that the questions posed by defense counsel, *see* Tr. at 1558–61, and the arguments made by defense counsel outside the presence of the jury, *see* Tr. at 1618–19, sufficiently put the trial judge

on notice as to the substance of what Tee's testimony would have been and the fact that it would have constituted prior inconsistent statements of the Peoples' witnesses.

**9.** It is true that Detective DeRosalia testified he could not recall whether Tee had accompanied Cianfrone, Tr. at 1104, 1111, 1117–18, but DeRosalia himself was not present at the time.

The evidence that corroborates Tee's version of events, at least at first glance, consists of Cianfrone's own notes. Although the trial court refused to receive them into evidence, on cross-examination Cianfrone testified that his investigation notes read, "# 5 Mack (Boss of 'Slice')." Tr. at 861. Cianfrone's notes also show, as the trial court was aware, that he wrote Peter Young under the notation "# 5 Mack" and "Mr. Mack is Slice," and under that, "516–358–7693," and under that, "# 5 photo." Exh. C–1, C–3, Nathanson Affirmation. Petitioner argues that these notes, combined with Cianfrone's testimony that Garcia identified photo # 5 (which is a picture of petitioner, see Exh. B, Nathanson Affidavit) from the second photo array, supports the defense theory that Garcia identified Mack.

As respondent points out, however, nothing indicates that Cianfrone's notes are from August 7, the date of the second hospital visit, when Garcia identified the second shooter. In fact, the part of Cianfrone's notes containing the information about photo # 5 and Mack is dated August 5, 1987, the date that Garcia saw the first photo array, which did not contain a picture of petitioner. It is thus equally, if not more, likely that Cianfrone's notes pertain to the first photo array. In any event, these circumstances undermine the extent to which Cianfrone's notes provide circumstantial indicia of reliability of the excluded testimony of Tee.

Although petitioner claims Tee's informant status bolsters the claim that the police would have brought him to the hospital for the identification procedure, as noted above, Tee himself specifically denied that he acted as a police informant. Tr. at 1562. While there exist conflicting versions of the facts on this issue,[10] common sense suggests that an experienced homicide detective would not take Tee to interview Garcia even if Tee were an informant. The notion that the police would risk revealing an informant's alliance with them in this way is difficult to accept.

In any event, based on all these circumstances, I agree that Tee's proposed testimony did not have the necessary indicia of reliability to be admissible as substantive evidence.

### b.. *Admission as Impeachment Evidence*

■ It was error for the trial court not to admit Tee's testimony for the non-hearsay purpose of impeaching the detective's and Garcia's testimony that Garcia identified petitioner as the shooter in the hospital. Such impeachment, which allows the jury to evaluate the credibility of testifying witnesses, may properly have been effected by extrinsic evidence. *See People v. Wise,* 46 N.Y.2d 321, 413 N.Y.S.2d 334, 385 N.E.2d 1262 (1978); *Rosario v. Kuhlman,* 839 F.2d 918, 925–26 (2d Cir.1988).

In *Chambers v. Mississippi,* the case on which respondent relies, the Court scrutinized the reliability of the proposed testimony that was excluded because the evidence was offered as substantive, not impeachment, evidence. 410 U.S. at 300–01, 93 S.Ct. 1038. Ultimately, the Court determined that the proposed testimony—that another person confessed to the crime of which petitioner was convicted—should have been admitted notwithstanding that it was hearsay, because there were considerable assurances of reliability of the proposed testimony.[11] *Id.* Accordingly, the *Chambers* test does not apply to evidence sought to be admitted only for impeachment purposes.

Defense counsel laid a proper foundation for the introduction of Tee's testimony. Defense counsel had asked Garcia whether Tee had come to the hospital, whether Garcia told Tee that Wright's accomplice had a gold tooth, and whether Garcia had viewed single photographs before he viewed the photo array.[12] Tr. at 1239, 1240, 1251, 1296–1300.

---

**10.** Respondent asserts that Tee did act as a government with respect to the Garcia–Garret shootings case. Respondent's Brief at 15.

**11.** Mississippi, the state in which Chambers was originally tried, did not have a hearsay exception for declarations against penal interest.

**12.** Presumably, Tee's testimony would have been that Garcia identified Mack from an individual photograph, not included in the photo array.

Finally, defense counsel objected at length to the judge's ruling to prohibit the impeachment testimony. Tr. at 1617–19.

While the judge's ruling was in error, it does not, as discussed below, rise to the level of a constitutional violation.

### 2. *Evidence that Garcia Had Identified the Shooter as "Slice" and "Another"*

Police Officer Bonaventura testified that Garcia told him, at the scene of the crime, that "Slice did this" or "Slice did it to me," Tr. at 496, 555, 557–58, 564, 581, 617, and, later, "Slice did this, shot me with an Uzi" or "Slice did it to me." Tr. at 495–96, 553, 559, 565, 584. On August 4, 1987, the day after the murder, Detective Ledda interviewed Bonaventura, and noted in his report that Bonaventura told him that Garcia also said that "another guy was with Slice." Amended Petition ¶ 21; Exh. D, Nathanson Affidavit. That evidence, petitioner contends, establishes that the "Slice" referred to by Garcia was a person, not a group; otherwise the reference to "another guy" makes little sense.[13] The court precluded as inadmissible hearsay defense counsel's attempt to impeach Garcia concerning what he had reported to the police by asking him about Detective Ledda's statement.

The court's ruling was correct. Garcia could not be impeached by a prior statement that Detective Bonaventura, not Garcia, made. Furthermore, while the defense could have appropriately impeached Detective Bonaventura's testimony regarding what Garcia told him by calling Detective Ledda to the stand, defense counsel did not establish the requisite foundation for introducing Ledda's testimony as evidence of a prior inconsistent statement by Bonaventura.[14] Detective Bonaventura was never confronted with the statement he allegedly made to Ledda as would be required under New York law. *See People v. Wise,* 46 N.Y.2d 321, 326, 413 N.Y.S.2d 334, 385 N.E.2d 1262 (1978); Fed.

R.Evid. 613(b). Accordingly, the court's exclusion of Ledda's testimony was proper.

### 3. *Mack's Declaration Against Penal Interest*

Petitioner sought to introduce at trial statements that Mack had made to his brother, Young, suggesting that Mack had committed the shootings with Wright. Young testified that on the night of the shootings his brother had gone somewhere with Wright with a weapon; that the two returned together; that Young later threw the weapon away "because it was the weapon that was used in the murder of some kids in the basement"; that after he had a conversation with his brother he disposed of the weapon "[t]hey kill the two kids in the basement [with]"; and that he disposed of "a murder weapon." Petitioner's Brief at 13 n. 5; Tr. at 1768, 1769, 1785. The court sustained a hearsay objection to defense counsel's attempt to elicit from Young Mack's actual confession to the shootings.

The court correctly rejected defense counsel's argument that Mack's confession fit within the declaration against penal interest exception to the hearsay rule. In New York, as under federal law, four prerequisites must be satisfied before the statement of a nontestifying third party is admissible as a declaration against penal interest:

(1) the declarant must be unavailable to testify by reason of death, absence from the jurisdiction, or refusal to testify on constitutional grounds; (2) the declarant must be aware at the time of its making that the statement was contrary to his penal interest; (3) the declarant must have competent knowledge of the underlying facts; and (4) there must be sufficient competent evidence independent of the declaration to assure its trustworthiness and reliability.

*People v. Brensic,* 70 N.Y.2d 9, 15, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987). The petitioner was unable to met this burden

---

13. Respondent argues that this evidence does not necessarily support petitioner's argument that Garcia intended "Slice" to mean a person rather than the organization. I disagree.

14. Petitioner's counsel conceded at oral argument that "the foundation is a problem," and that trial counsel meant to ask Garcia about his statements to Ledda, not Bonaventura's statements to Ledda. Tr. Feb. 27, 1998, at 21.

since he could not present "sufficient competent evidence independent of the declaration to assure its trustworthiness." *People v. Thomas*, 68 N.Y.2d 194, 197, 507 N.Y.S.2d 973, 500 N.E.2d 293 (1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1609 (1987). The only corroborative evidence offered—Garcia's purported identification of Mack as one of the perpetrators and Wright's testimony that Mack, not petitioner, was his accomplice—were not sufficient to overcome the extreme unreliability of an attempt by one of petitioner's friends to exculpate the petitioner by inculpating a dead man.

Petitioner correctly notes that under New York law less exacting standards must be applied where, as here, the declaration is offered by a defendant to exculpate himself, as distinguished from a declaration offered by the People to inculpate the defendant. *See People v. Stevens*, 212 A.D.2d 746, 747, 622 N.Y.S.2d 781, 781 (2d Dep't 1995) (stating that defendant must establish "reasonable possibility" that the statement offered "might be true"). Nevertheless, the fact that Young, a convicted robber and murderer serving at least fifty years in prison, did not come forward with this supposed confession by his brother until after his brother's death, six years after petitioner's arrest, amply supported the court's determination that it was unreliable.[15]

#### 4. *Cianfrone's Motive to Protect Peter Young*

■ Wright testified that before the shooting, he saw Detective Cianfrone obtain $15,000 from Mack and saw Mack tell Cianfrone to "stay in touch." Tr. at 1654. The petitioner presented this testimony as evidence of Cianfrone's alleged bias to protect Mack and thus frame petitioner. The court, however, prohibited defense counsel from questioning Young, Mack's brother, about whether or not he knew Cianfrone or whether Cianfrone had a nickname within the Slice Organization.

The evidence the court allowed—Wright's testimony about the $15,000 and the "stay in touch" remark—damaged the People's case more than the excluded testimony. It sufficiently presented petitioner's theory that Cianfrone framed petitioner in order to spare Mack, who was bribing him. It was well within the court's discretion to limit additional questions on this subject which, at best, further supported the alleged bias, but remained only marginally relevant to the trial. *See, e.g., Jones v. Berry*, 880 F.2d 670, 673 (2d Cir.1989). Also, the defense made no offer of proof regarding Young's proposed testimony, and there exists ample reason to be skeptical of its substance. Petitioner complains that he could not ask Young if Cianfrone had a nickname in Slice, but Wright, himself Mack's "right hand man," testified that he knew of no such nickname. Without further substantiation of the accusations against Cianfrone, the court properly sustained objections to further questioning. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 ("Trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.").

#### 5. *The Jury Instruction Concerning Wright's Videotaped Statement*

■ Wright testified for the defense that petitioner was not the second shooter, that he made a false statement to the police implicating petitioner, and that the police had coerced him through beatings. The theory of this aspect of the defense was strained, to put it mildly. Through Wright, petitioner contended that the police beat Wright in order to implicate *Mack*. Wright claimed that he submitted to the extent that he identified a co-perpetrator, but retained the presence of mind to falsely implicate petitioner. The implausibility of that theory is overshadowed

---

**15.** In any case, petitioner was able to introduce the confession—at least inferentially—notwithstanding the court's ruling. In response to a question to Young by defense counsel regarding his conversation with his brother after the shooting, Young stated, "After we call it—They kill the two kids in the basement." Tr. at 1769. Even if the trial court had erroneously ruled Mack's confession inadmissible hearsay, the error was harmless.

by its absurdity in light of petitioner's claim that Cianfrone was corruptly trying to frame *petitioner*. Thus, petitioner claims that the very officer who sought to exonerate Mack and frame petitioner had beaten Wright in order to obtain a statement implicating Mack.

In any event, the court allowed the prosecutor to play Wright's videotaped confession for the jury in order to impeach Wright's testimony that he implicated the petitioner because the police brutalized him. Petitioner now claims that the judge did not give a proper limiting instruction to the jury concerning the weight to accord the videotape.

The court did, in fact, instruct the jury that prior statements, specifically of Garfield Wright, could not be considered as evidence in chief:

> During the testimony of witnesses of James Garcia and Garfield Wright [sic], there was evidence presented that these witnesses had made prior statements allegedly inconsistent with their trial testimony. Such prior statement[s] may not be considered by you for the truth of its content; however, such prior statement, if found by you to be inconsistent with the witnesses' testimony, may then be considered by you as a factor in determining the credibility of the witnesses' own trial testimony.

Charge at 2012–13. At the charge conference, defense counsel requested that the court charge the jury specifically that the videotape could not be considered by them as evidence in chief, but only as impeachment evidence as a prior inconsistent statement. The court declined this request, because such a specific charge "would be in effect really marshaling the evidence there and then pointing exactly what I want them to do [sic]. It is up to them. If it is—If it was for the purpose of showing inconsistency, it is up to them to decide there were inconsistencies and not me." Tr. at 1829–30.

Petitioner alleges that this response evidences the judge's misunderstanding of the law of impeachment evidence and that the judge thought the jurors could consider the videotape as evidence in chief if they wished. I disagree. In fact, the judge's comments show that she thought it more appropriate

for the jury to determine for itself whether the videotaped statement was in fact inconsistent with the trial testimony. The judge plainly believed that the charge requested by defense counsel might have, if anything, prejudiced the defense, as it would have highlighted to the jury that the videotaped statement was inconsistent with Wright's trial testimony. Moreover, nothing appeared in the judge's instruction that would have allowed the jury to consider the prior statements as substantive evidence even if the jury did not find them inconsistent. To the contrary, before addressing the jury regarding the effect of any inconsistency, the court told the jury that it could not consider any prior statement "for the truth of its content." Charge at 2012.

Although it might well have been more prudent for the trial court specifically to address the videotape in its charge to the jury, I find no error in the charge as given. Furthermore, in order to obtain a writ of habeas corpus based on an error in the state court's instructions to the jury, the petitioner must show that the error violated a right guaranteed by federal constitutional law. *See Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir.1985). The relevant issue is not whether an instruction was "undesirable" or "erroneous," but rather "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* 414 U.S. at 147, 94 S.Ct. 396. Even if there were a risk that the jury might consider the videotape as evidence in chief, the damaging evidence on the tape, *i.e.,* Wright's implication of petitioner as his accomplice, was in fact already in evidence through Wright's own testimony at the trial. Thus, even if the jury erroneously considered the content of Wright's video for its truth, the video offered jurors no information they did not already have. Therefore, the substance of the videotape could not have deprived petitioner of a fair trial.

Finally, the relevant Supreme Court precedent would have permitted the jury to consider the contents of Wright's videotape as evidence in chief. In *California v. Green,*

399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Court concluded that admitting a declarant's inconsistent out-of-court statement did not violate the Confrontation Clause "as long as the declarant is testifying as a witness and subject to full and effective cross-examination at the trial itself." Since Wright was called as a witness at petitioner's trial—by the defense—he was subject to cross-examination, which the Supreme Court has held is just as effective, if not more effective, than contemporaneous cross-examination in protecting the defendant's confrontation rights. *Id.* 399 U.S. at 155, 157–62, 90 S.Ct. 1930.

Therefore, even if the introduction of Wright's videotaped statement, together with the court's general instructions on the use of that evidence, was erroneous, petitioner suffered no violation of his rights to a fair trial or confrontation.

D. *Harmless Error*

■ It was error for the court not to admit Tee's testimony for the non-hearsay purpose of impeaching the detective's and Garcia's testimony that Garcia, while in the hospital, identified petitioner as the second shooter. Petitioner claims that this exclusion of evidence deprived him of his right to present a complete defense.

"Generally, erroneous evidentiary rulings of a state trial court do not rise to the level of a constitutional deprivation upon which a writ of habeas corpus may be issued." *Jenkins v. Bara,* 663 F.Supp. 891, 899 (E.D.N.Y. 1987); *Collins v. Scully,* 582 F.Supp. 1100, 1104–5 (S.D.N.Y.1984). In order to identify the circumstances in which such error achieves constitutional magnitude, the Supreme Court applies the standard of "materiality," explained in *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976):

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justifica-

tion for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

The question, therefore, centers upon whether the ruling regarding Tee's testimony, viewed in light of the whole record and evaluating the strength of the evidence supporting the conviction, deprived petitioner of a fundamentally fair trial. *See Agard v. Portuondo,* 117 F.3d 696, 705 (2d Cir.1997). The record does not support petitioner's claim that this ruling deprived him of his right to present a defense.

Petitioner in fact presented at trial the defense that he now asserts was precluded, namely that the true perpetrator was Mack, that Cianfrone framed petitioner as Wright's accomplice because Mack had bribed Cianfrone, and that Wright had implicated petitioner only because the police beat him into implicating someone, though he remained afraid to implicate Mack. In support of this theory, petitioner was able to admit: Wright's testimony that the police beat him into implicating petitioner (although according to Wright, they wanted him to implicate Mack), and that Mack was, in fact, his accomplice; and Young's testimony that Mack bribed Cianfrone and, in abbreviated form, that Mack implicated himself in the shooting. Tee's testimony also supported several aspects of the defense. Tee testified that he accompanied the detectives on both hospital visits to see Garcia and showed Garcia an individual photograph of Mack before showing him the photo array. On cross-examination of Cianfrone, defense counsel elicited an admission from Cianfrone that his notes from the investigation identified Mack's picture as "photo # 5," the same number of the photo that Garcia picked from the second photo array. Therefore, the defense was at least able, particularly through Tee's testimony, and cross-examination of Cianfrone, to raise the question in the minds of the jurors that Garcia and the detectives framed petitioner and that Garcia had, in fact, identified Mack as Wright's accomplice. While I agree with petitioner's counsel that the inference that Garcia had identified Mack is not as "compel-

ling" as direct testimony to that effect, Tr. Feb. 27, 1998, at 13, I nevertheless conclude from the trial record that the jury considered the defense theory and rejected it.

More importantly, Tee's additional testimony, since it was hearsay, would have been admissible solely to impeach Garcia's and the detective's credibility. While the credibility of the People's witnesses clearly stood as a crucial issue in this case, the excluded testimony of Tee would have exerted only limited force. First, Tee was inherently unreliable. His testimony about being present when Garcia viewed photographs makes sense only if Tee was an informant, which Tee denied. Moreover, the defense had ample opportunity to impeach the People's witnesses through Tee's actual testimony (which contradicted Garcia's and the detectives' testimony in almost every respect), the testimony of Wright and Young, and very thorough cross-examination of the detectives by defense counsel. The defense emphasized on cross-examination and in summation the lack of an explanation for the link between "photo # 5" and the "Mack" in Cianfrone's notes. *See* Defense Summation, Tr. at 1858, 1894, 1897. In light of the substantial amount of evidence attacking the credibility of the People's witnesses which the court allowed, it is unreasonable to assume that additional impeachment testimony about Garcia's identification of Mack would have created a reasonable doubt that did not otherwise exist, or that exclusion of the impeachment evidence deprived petitioner of his right to meaningfully confront witnesses against him.

Finally, viewing the evidence as a whole, any error was harmless. Even a constitutional error requires vacatur of the state court conviction on habeas review only if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).[16] In this case, the evidence of petitioner's guilt was overwhelming. Garcia had

seen petitioner "hanging out" with Wright in Pillow territory just one week before the shooting. Tr. at 1314, 1326. The shooting incident itself took about thirty minutes, which gave Garcia ample time to identify the shooters, Tr. at 1199, and Garcia identified petitioner as the second assailant from a photo array and at trial, Tr. at 1183; 1191–92. Upon his first arrest, petitioner admitted that he had accompanied Wright to the scene of the shooting, armed with a .357–caliber revolver, though he denied that he actually shot his gun. Tr. at 681–83; 1072–73. This admission, together with petitioner's presence with Wright at Slice headquarters when the police arrived, constitutes powerful evidence of petitioner's affiliation with Wright and participation in the crime. In addition, there was evidence of petitioner's flight after his first arrest. Tr. 1343, 1363. After his re-arrest in Florida by FBI agents who had nothing to do with the investigation five years earlier, petitioner again admitted involvement in the shootings. Tr. at 1363, 1399, 1401–02, 1411; 1445, 1495, 1497. Finally, the ballistics evidence, together with Garcia's testimony, strongly supported the notion that petitioner had indeed fired his revolver at Garrett and Garcia. Tr. at 998, 1000, 1003, 106, 1014, 1018, 1021, 1043–44; 1181, 1183, 1201, 1203, 1294.

By contrast, petitioner's factual theory was weak. It was a transparent revival of the time honored and seldom successful technique of shifting blame to a person who has since died, using testimony of extremely biased witnesses who had nothing to lose by lying. All of his witnesses were convicted felons allied with the petitioner. The only eyewitness testimony offered by petitioner was somewhat incredible. Wright admitted that he had inculpated petitioner twice, once on videotape and once under oath in a courtroom. His subsequent explanation for those statements, that he had been beaten, coerced, and coached, were belied by the records of those statements. They also raised an unanswerable question: why would

---

16. Some courts have taken the position that in cases such as this one, where the alleged constitutional error is the deprivation of the fundamental right to a fair trial, such an error cannot, by definition, be harmless. Accordingly, "the court's broader inquiry into the constitutional dimensions of an erroneous exclusion of evi-

dence subsumes the harmless error analysis and obviates the need for any additional analysis." *Dey v. Scully*, 952 F.Supp. 957, 976 (E.D.N.Y. 1997) (declining to engage in harmless error analysis and discussing interrelationship of two standards in detail).

a police officer who supposedly sought to frame petitioner attempt to beat Wright into implicating Mack? Tee's testimony, if believed, may well have undermined the credibility of the detectives and Garcia. However, Tee's assertion that the detective had taken him to the hospital to witness the photo array was itself incredible.

In sum, petitioner was able to present his defense, despite the exclusion of some of his proffered evidence. The principal problem with the defense was not the excluded evidence. Since the admission of this evidence would not likely have changed the verdict, any error in excluding it was harmless. *See Brecht,* 507 U.S. at 637–38, 113 S.Ct. 1710.

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. However, petitioner has made a "substantial showing" that one of his claims raises a constitutional question "deserving of appellate review." *See Reyes v. Keane,* 90 F.3d 676, 680 (2d Cir.1996); *Rodriquez v. Scully,* 905 F.2d 24 (2d Cir.1990). Specifically, petitioner's claim that limitations on Tee's testimony deprived him of a fair trial deserves appellate review. Accordingly, I am issuing a certificate of appealability with respect to that matter.

So Ordered.